1

2

3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA SADLOCK,<br><br>Plaintiff,<br><br>v.<br><br>THE WALT DISNEY COMPANY,<br><br>Defendant. | Case No.  22-cv-09155-EMC<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY THE ACTION**<br><br>Docket No. 18 |

Plaintiff Joshua Sadlock has brought a class action against Defendant The Walt Disney Co. ("Disney") for a violation of a Pennsylvania statute.  Specifically, Mr. Sadlock asserts that Disney violated the Pennsylvania Wiretapping and Electronic Surveillance Control Act by using a product offered by Oracle to collect information about him while he browsed ESPN.com, a website that Disney owns or operates.

Currently pending before the Court is Disney's motion to compel arbitration and stay the action.  Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** Disney's motion.

## I.        FACTUAL & PROCEDURAL BACKGROUND

A.        Complaint

In his complaint, Mr. Sadlock alleges as follows.

Disney is a company that owns and operates the website ESPN.com.  *See* Compl. ¶ 5.

Oracle is a software company that provides services and products to businesses and enterprises, including Disney.  *See* Compl. ¶ 11.  One of its products is called "Oracle Advertising and Customer Experience," also known as "Oracle CX."  *See* Compl. ¶¶ 7, 12.  With Oracle CX –

United States District Court
Northern District of California

in particular, one of the product's marketing tools known as "BlueKai" – Oracle can, on behalf of a customer, collect and manage data from people who visit the Oracle customer's website. *See* Compl. ¶¶ 7, 15-16; *see also* Compl. ¶ 24 (making allegations about the kind of data BlueKai collects – *e.g.*, pages viewed, purchase intent, keystrokes). Specifically,

> website owners [insert] a Core Tag onto their websites, which enables Oracle BlueKai to collect significant user data. Oracle then associates that data to a specific user, compiles that data with other data about the user Oracle has in its possession, and provides that data to website owners to enable website owners to hyper target users in marketing campaigns. Oracle then retains that data and uses it to assist other website owners.

Compl. ¶ 29.

Disney entered into a contract with Oracle which enabled "Oracle to intercept communications between [Disney] and visitors to the ESPN website." Compl. ¶ 31.

On or about November 12, 2022, Mr. Sadlock – who resides in Pennsylvania – visited and browsed ESPN.com on his computer. "During the visit, Mr. Sadlock's keystrokes, mouse clicks, and other communications – such as the specific web pages he viewed – were intercepted in real time by Oracle." Compl. ¶ 4.

Based on, *inter alia*, the above allegations, Mr. Sadlock has brought a class action, in which he asserts a single claim: violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act ("WESCA"). *See* 18 Pa. C.S. § 5701 *et seq.* The Act provides in relevant part that

> [a]ny person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of this chapter shall have a civil cause of action against any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication; and shall be entitled to recover from any such person:
>
> (1)   Actual damages, but not less than liquidated damages computed at the rate of $ 100 a day for each day of violation, or $ 1,000, whichever is higher.
>
> (2)   Punitive damages.
>
> (3)   A reasonable attorney's fee and other litigation costs reasonably incurred.

*Id.* § 5725(a). The class is defined as "all Pennsylvania residents who visited ESPN.com in

1   Pennsylvania and whose electronic communications were intercepted or recorded by Oracle."[1]

2   Compl. ¶ 37.

3   B.      Arbitration Agreement

4           Disney has moved to compel Mr. Sadlock's case to arbitration.  According to Disney, there

5   is an arbitration agreement between itself and Mr. Sadlock to which he is bound.  In support of

6   this position, Disney has provided evidence to support the following.

7           1.      ESPN Account

8           Mr. Sadlock created an ESPN account on December 4, 2013 using the email address

9   sadlockj@gmail.com.  *See* Connor Decl. ¶ 4.  "When customers register their ESPN accounts,

10  they must first agree to Disney's Terms of Use governing ESPN accounts."  Connor Decl. ¶ 5.  A

11  copy of the Terms of Use that governed at the time Mr. Sadlock created his account can be found

12  at Exhibit A to the Connor Declaration.  The Terms of Use define "Disney Services" as Disney

13  Interactive's "sites, software, applications, content, products, and services."  Connor Decl., Ex. A

14  (Terms of Use at 1).  The Terms of Use provide that they "govern your use and our provision of

15  the Disney Services on which these terms are posted."  Connor Decl., Ex A (Terms of Use at 1).

16  On the first page, the Terms of Use state:

17          PLEASE READ THESE TERMS CAREFULLY BEFORE USING
            THE DISNEY SERVICES.
18

19  _____

20  [1] Mr. Sadlock brought a claim under the WESCA based on the Third Circuit's analysis in *Poa v.
    Harriet Carter* Gifts*, Inc.*, 52 F.4th 121, 130 (3d Cir. 2022).  In *Poa*, the Third Circuit considered
21  when an "interception" occurs.

22          [W]e know from the statute's definition that an interception involves
            the "[a]ural or other acquisition of the contents of any wire,
23          electronic or oral communication through the use of any electronic,
            mechanical or other device."  And while the statute does not further
24          define "acquisition," we can apply the word's "common and
            approved usage."  "Acquisition" means "the act of acquiring."  And
25          "acquire," in turn, means "to come into possession or control of," or
            to "gain [or] obtain."  The result is that an interception occurs where
26          there is an act taken to gain possession of communications using a
            device.

27  *Id.* at 130.  In the electronic communication context, "[a defendant] intercept[s] [the plaintiff's]
    communications at the point where it routed those communications to its own servers" – *i.e.*, at the
28  plaintiff's "browser, not where the signals were received at [the defendant's] servers.  *Id.* at 131.

United States District Court
Northern District of California

1

2

3

> ANY DISPUTE BETWEEN YOU AND US MUST BE
> RESOLVED BY INDIVIDUAL BINDING ARBITRATION.
> PLEASE READ THE ARBITRATION PROVISION IN TEHSE
> TERMS AS IT AFFECTS YOUR RIGHTS UNDER THIS
> CONTRACT.

4   Connor Decl., Ex. A (Terms of Use at 1).

5           The actual arbitration provision is found in § 6, titled "Additional Provisions."  The

6   arbitration provision is titled "Binding Arbitration and Class Action Waiver."  It states that

7

8

9

10

> [y]ou and Disney Interactive agree to arbitrate all disputes between
> you and The Walt Disney Company or its affiliates, except disputes
> relating to the enforcement of The Walt Disney Company or its
> affiliates' intellectual property rights.  "Dispute" includes any
> dispute, action or other controversy between you and us concerning
> the Disney Services or these terms, whether in contract, tort,
> warranty, statute or regulation, or other legal or equitable basis.

11  Connor Decl., Ex. A (Terms of Use at 11).

12          The arbitration provision further states that "[y]ou and Disney Interactive will [first]

13  attempt to resolve a dispute through information negotiation," but, after sixty days, "you or we

14  may commence arbitration."  Connor Decl., Ex. A (Terms of Use at 11).  If there is arbitration, it

15  is binding "except for a limited right of appeal under the U.S. Federal Arbitration Act.  YOU ARE

16  GIVING UP THE RIGHT TO LITIGATE A DISPUTE IN COURT BEFORE A JUDGE OR

17  JURY."  Connor Decl., Ex. A (Terms of Use at 11).  In addition, arbitration cannot be brought on

18  a classwide basis: "PROCEEDINGS TO RESOLVE OR LITIGATE A DISPUTE IN ANY

19  FORUM WILL BE CONDUCTED ON AN INDIVIDUAL BASIS.  Neither you nor Disney

20  Interactive will seek to have a dispute heard as a class action, private attorney general action, or in

21  any other proceeding in which either party acts or proposes to act in a representative capacity."

22  Connor Decl., Ex. A (Terms of Use at 12).

23          2.      Disney Streaming (ESPN+ and Disney+)

24          Mr. Sadlock created a Disney Streaming account on November 8, 2019.  *See* Morgan Decl.

25  ¶ 5.  He "enrolled in a stand-alone Disney+ subscription directly through the Disney website."

26  Morgan Decl. ¶ 6.  He "upgraded his Disney+ stand-alone subscription into a Disney Bundle

27  subscription – which included ESPN+ – on September 29, 2021."  Morgan Decl. ¶ 7.

28          In September 2021, there were "two possible Subscription Registration Processes" for "an

United States District Court
Northern District of California

4

existing Disney+ subscriber to enroll in the Disney Bundle."  Morgan Decl. ¶ 9.

- First, the existing Disney+ subscriber could "enter the Disney+ website and stack the Disney Bundle with [the] existing Disney+ subscription ('Stack Registration Process')."  Morgan Decl. ¶ 9.
- Second, the existing Disney+ subscriber could "enter the account settings within his existing Disney+ subscription and switch into the Disney Bundle ('Switch Registration Process')."  Morgan Decl. ¶ 9.

Disney does not provide any evidence as to which registration process Mr. Sadlock actually used. However, it has offered evidence that "Mr. Sadlock could not have enrolled in and registered his Disney Bundle subscription in 2021 without completing either the Stack Registration Process . . . or, alternatively, the Switch Registration Process . . . ."  Morgan Decl. ¶ 12.

a.    <u>Stack Registration Process</u>

For the Stack Registration Process, a subscriber "would either go directly to the Disney+ website (www.disneyplus.com) or would arrive at the marketing landing page (www.disneyplus.com/disneybundle).  The customer would then be presented with the option to 'Get the Disney Bundle,'" which, as noted above, included ESPN+.  Morgan Decl. ¶ 10(a) & Ex. A (page 3, titled "Disney+ Welcome Screen," and page 4 titled "Marketing Landing Page").

///
///
///
///
///
///
///
///
///
///
///

United States District Court
Northern District of California

The customer would then get to the registration webpage:



Morgan Decl. ¶ 10(b) & Ex. A (page 5, titled "Enter Email").  As indicated above, the registration webpage would ask the customer to enter his or her email address.  The registration webpage displayed, at the bottom, a large blue button with white font that stated "AGREE & CONITNUE." Above the button was a paragraph composed of three sentences/seven lines.  The third sentence stated: "By clicking 'Agree & Continue,' you agree to our Subscriber Agreement and acknowledge that you have read our Privacy Policy and California Privacy Notice."  Subscriber Agreement, Privacy Policy, and California Privacy Notice were in blue font (contrasting with the whitish/greyish font otherwise used) and underlined to indicate that they were hyperlinks.

"If the customer had an existing Disney Streaming subscription associated with the email address entered, they would next be presented with the password entry webpage to complete the login to their account."  Morgan Decl. ¶ 10(c) & Ex. A (page 6, titled "Lot In – Enter Password").

The customer would then reach the payment webpage:

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11

United States District Court
Northern District of California

12
13
14
15
16
17
18
19
20
21
22
23



24   Morgan Decl. ¶ 10(d) & Ex. A (page 7, titled "Billing Screen").  At the bottom of the payment

25   webpage, there was a large blue button with white font that stated "AGREE & SUBSCRIBE."

26   Above the button was a paragraph composed of three sentences/six lines.  The first sentence

27   stated: "By clicking 'Agree & Subscribe,' you agree to our Subscriber Agreement and you are

28   enrolling in automatic payments for The Disney Bundle of $13.99/month (plus tax where

7

1    applicable) that will continue until you cancel."  Morgan Decl., Ex. A (page 7, titled Billing

2    Screen").

3            b.      Switch Registration Process

4            As noted above, under the Switch Registration Process, an existing Disney+ subscriber

5    could "enter the account settings within his existing Disney+ subscription and switch into the

6    Disney Bundle ('Switch Registration Process')."  Morgan Decl. ¶ 9.

7            The customer would "navigate to their Account Settings," and the Account Settings page

8    would "display[] the customer's email address, password, and existing subscription."  Morgan

9    Decl. ¶ 11(a)-(b) & Ex. A (page 11, titled "Navigating to Account Settings from Top Navigation

10   Menu," and page 12, titled "Account Settings").  The page would also give the customer the

11   option to "'Switch to the Disney Bundle for $13.99/mo.'"  Morgan Decl. ¶ 11(b) & Ex. A (page

12   12, titled "Account Settings").

13           If the customer chose to switch into the Disney Bundle, he or she would be "taken to an

14   *identical* payment webpage as was displayed in the Stack Registration Process," *i.e.*, the long form

15   shown above, and not the preceding registration webpage.  Morgan Decl. ¶ 11(c) & Ex. A (page

16   13, titled "Billing Screen") (emphasis added).

17           c.      Subscriber Agreement

18           The Stack and Switch Registration Processes both refer to a Subscriber Agreement.

19   Disney has offered evidence that the 2021 Subscriber Agreement contains a "Binding Arbitration

20   and Class Action Waiver provision."  Morgan Decl. ¶ 14 & Ex. B.  The first page of the agreement

21   includes the following language:

22           **PLEASE READ THIS SUBSCRIBER AGREEMENT . . .**
             **CAREFULLY BEFORE USING THE DISNEY+ SERVICE OR**
23           **ESPN+ SERVICE.**

24           **THIS AGREEMENT WILL GOVERN YOUR USE OF THE**
             **DISNEY+ AND ESPN+ SERVICES.**
25

26           You agree to the Subscriber Agreement by clicking "Agree &
             Continue" or other industry standard mechanism during the Disney+
27           and/or ESPN+ registration process and ratify your agreement when
             you use any aspect of the Disney+ Service or ESPN+ Service. . . .
28           We may amend this Agreement.  Any such amendment will be
             effective thirty (30) days following either our dispatch of a notice to

United States District Court
Northern District of California

you or our posting of the amendment on the Disney+ Service or ESPN+ Service. . . . .

**ANY DISPUTE BETWEEN YOU AND US, EXCEPT FOR SMALL CLAIMS, IS SUBJECT TO A CLASS ACTION WAIVER AND MUST BE RESOLVED BY INDIVIDUAL BINDING ARBITRATION. PLEASE READ THE ARBITRATION PROVISION IN THIS AGREEMENT AS IT AFFECTS YOUR RIGHTS UNDER THIS CONTRACT.**

Morgan Decl., Ex. B (2021 Subscriber Agreement at 1).

Section 7 of the agreement contains the "Binding Arbitration and Class Action Waiver." Section 7 includes the following language:

PROCEEDINGS TO RESOLVE OR LITIGATE A DISPUTE IN ANY FORUM WILL BE CONDUCTED ON AN INDIVIDUAL BASIS. Neither you nor Disney+ nor ESPN+ will seek to have a dispute heard as a class action or private attorney general action or in any other proceeding in which either party acts or proposes to act in a representative capacity. No arbitration or proceeding can be combined with another without the prior written consent of all parties to the arbitrations or proceedings.

You and Disney+ and/or ESPN+ agree to arbitrate, as provided below, all disputes between you (including any related disputes involving The Walt Disney Company or its affiliates), that are not resolved informally, except disputes relating to the ownership or enforcement of intellectual property rights. "**Dispute**" includes any dispute, action, or other controversy, whether based on past, present, or future events, between you and us concerning the Disney+ Service, ESPN+ Service, or this Agreement, whether in contract, tort, warranty, statute, regulation, or other legal or equitable basis. You and Disney+ and/or ESPN+ empower the arbitrator with the exclusive authority to resolve any dispute relating to the interpretation, applicability or enforceability of these terms or the formation of this contract, including the arbitrability of any dispute and any claim that all or any part of this Subscriber Agreement are void or voidable.

Morgan Decl., Ex. B (2021 Subscriber Agreement § 7) (emphasis in original).

The 2022 Subscriber Agreement contains similar provisions, including a "Binding Arbitration and Class Action waiver provision." Morgan Decl. ¶ 17 & Ex. C.

Beginning in September 2022, Disney Streaming sent to its existing Disney+ and ESPN+ subscribers an email notifying them of the 2022 Subscriber Agreement (which was an update of the 2021 agreement). *See* Raschke Decl. ¶ 3. Two such notification emails were sent to Mr. Sadlock. *See* Raschke Decl. ¶ 5 & Ex. A (email). Each email had the subject line: "We're

United States District Court
Northern District of California

updating our Subscriber Agreement."  The body of the email repeated that statement as, in effect,

a header ("WE'RE UPDATING OUR SUBSCRIBER AGREEMENT") and then stated as

follows:

> In advance of the launch of the ad-supported tier on Disney+, we wanted to let you know that we are making some corresponding updates to our Subscriber Agreement.  We also took the opportunity to streamline it to make it even easier to read and update some of our other terms.
>
> These terms will apply as of today for new subscribers.  For prior and existing subscribers, like you, these terms will be effective beginning on November 3, 2022 (and the prior version of our Subscriber Agreement will apply until then).
>
> We encourage you to review the updated Subscriber Agreement in full and save a copy for your files.  Once effective, it will govern your use and enjoyment of your Disney+ or ESPN+ subscription. We are as committed as ever to making sure you have an enjoyable streaming experience.  Please visit our Help Center for more information about your subscription.
>
> We have highlighted some of the changes for your reference:
>
> - We're reflecting that with the launch of the ad-supported tier, subscriptions to our streaming services may be offered in tiers that differ, including with respect to features, pricing, and other factors.
>
> - We're clarifying that, by signing up for and using our streaming services, you consent to receive email and other forms of electronic notices and disclosures relating to your subscription and our services (for example, we will attempt to notify you via email before price changes).
>
> - We're explaining that subscriptions to the Disney Bundle will be subject to terms and disclosures presented during the sign-up and purchase process and related FAQs in our Help Center.
>
> - We're updating the arbitration agreement to be more specific about the procedures for resolving any disputes relating to your subscription and our services.

Raschke Decl., Ex. A (email).

## II.        DISCUSSION

A.        Legal Standard

There is no dispute that the Federal Arbitration Act ("FAA") applies in the instant case.

Under the FAA, an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon

10

1   such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "The

2   final clause of § 2, its saving clause, permits agreements to arbitrate to be invalidated by generally

3   applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that

4   apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is

5   at issue."  *Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d 425, 432 (9th Cir. 2015) (internal

6   quotation marks omitted).

7   B.   Contract Formation

8       Although Mr. Sadlock does not dispute that the FAA governs, he challenges Disney's

9   contention that the parties had an agreement to arbitrate.  Whether there was an agreement to

10  arbitrate is a matter of contract formation.  The FAA does not govern this question of contract

11  formation.  Instead, contract formation is governed by state law.  *See Berman v. Freedom Fin.*

12  *Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) ("In determining whether the parties have agreed

13  to arbitrate a particular dispute, federal courts apply state-law principles of contract formation.").

14  The parties agree that which specific state's law governs is not material as they are effectively the

15  same, and therefore the Court may look to California law.[2]  *See id.* ("[W]e need not decide which

16  State's law governs 'because both California law and New York law dictate the same outcome.'").

17          To form a contract under California law, the parties must manifest
            their mutual assent to the terms of the agreement.  Parties
18          traditionally manifest assent by written or spoken word, but they can
            also do so through conduct.  However, "[t]he conduct of a party is
19          not effective as a manifestation of assent unless he intends to engage
            in the conduct and knows or has reason to know that the other party
20          may infer from his conduct that he assents."

21          These elemental principles of contract formation apply with equal
            force to contracts formed online.  Thus, if a website offers
22          contractual terms to those who use the site, and a user engages in
            conduct that manifests her acceptance of those terms, an enforceable
23          agreement can be formed.

24

25  _____

26  [2] "'The issue of contract formation . . . is not a delegable gateway issue' (*i.e.*, an issue for an
    arbitrator to decide instead of a court)."  *Burzdak v. Univ. Screen Arts, Inc.*, No. 21-cv-02148-
    EMC, 2021 U.S. Dist. LEXIS 154091, at *8 n.2 (N.D. Cal. Aug. 16, 2021); *see also Kum Tat Ltd.*
27  *v. Linden Ox Pasture, LLC*, 845 F.3d 979, 983 (9th Cir. 2017) (stating that, "[a]lthough challenges
    to the *validity* of a contract with an arbitration clause are to be decided by the arbitrator, challenges
28  to the very *existence* of the contract are, in general, properly directed to the court") (emphasis
    added).

United States District Court
Northern District of California

1    *Id.* at 855-56.

2           That being said, "'[a]n offeree, regardless of apparent manifestation of his consent, is not

3    bound by inconspicuous contractual provisions of which he was *unaware*, contained in a

4    document whose contractual nature is not *obvious*.'"  *Knutson v. Sirius XM Radio Inc.*, 771 F.3d

5    559, 566 (9th Cir. 2014) (emphasis added; quoting *Windsor Mills, Inc. v. Collins & Aikman Corp.*,

6    25 Cal. App. 3d 987, 993 (1972)).

7                     Unless [a] website operator can show that a consumer has *actual*
                     *knowledge* of the agreement, an enforceable contract will be found
8                     based on an *inquiry notice* theory only if: (1) the website provides
                     reasonably conspicuous notice of the terms to which the consumer
9                     will be bound; and (2) the consumer takes some action, such as
                     clicking a button or checking a box, that unambiguously manifests
10                    his or her assent to those terms.

11   *Berman*, 30 F.4th at 856 (emphasis added; indicating that the above standard applies under both

12   California and New York law).

13          In the case at bar, Disney is not making any claim that Mr. Sadlock had actual notice of the

14   Subscriber Agreement or the arbitration provision contained therein.  Thus, resolution of the

15   pending motion turns on an inquiry notice analysis.

16   C.     *Berman*

17          The most recent case in which the Ninth Circuit has addressed an inquiry notice issue is

18   *Berman*.  In *Berman*, the Ninth Circuit evaluated whether inquiry notice had been established

19   where consumers were presented with the following webpages:

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///





*Id.* at 860 (Appendix A).[3]

///

///

///

///

///

///

---

[3] The text above the "I AGREE" button reads (all in grey font): "I understand and agree to the <u>Terms and Conditions</u> which includes mandatory arbitration and <u>Privacy Policy</u>."

*Id.* at 861 (Appendix B).[4]

---

[4] Similar to above, the text above the "Continue >>" button reads (all in grey font): "I understand and agree to the <u>Terms & Conditions</u> which includes mandatory arbitration and <u>Privacy Policy</u>."

14

The Ninth Circuit first held that neither webpage provided reasonably conspicuous notice of the terms and conditions at issue.

> First, to be conspicuous in this context, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it. The text disclosing the existence of the terms and conditions on these websites is the antithesis of conspicuous. It is printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye. The comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else. And the textual notice is further deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable critical text. Far from meeting the requirement that a webpage must take steps "to capture the user's attention and secure her assent," the design and content of these webpages draw the user's attention away from the most important part of the page.

*Id.* at 856-57.

The court continued:

> Second, while it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent. Simply underscoring words or phrases, as in the webpages at issue here, will often be insufficient to alert a reasonably prudent user that a clickable link exists. Because our inquiry notice standard demands conspicuousness tailored to the reasonably prudent Internet user, not to the expert user, the design of the hyperlinks must put such a user on notice of their existence.
>
> A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently "set apart" from the surrounding text. Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage. Consumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to "ferret out hyperlinks." The failure to clearly denote the hyperlinks here fails our conspicuousness test.

*Id.* at 857.

The Ninth Circuit then went on to consider whether there had been unambiguous manifestation of assent. The court concluded that the consumers

> did not take any action that unambiguously manifested their assent

15

to be bound by the terms and conditions.  Defendants rely on plaintiffs' act of clicking on the large green "continue" buttons as manifestation of their assent, but merely clicking on a button on a webpage, viewed in the abstract, does not signify a user's agreement to anything.  A user's click of a button can be construed as an unambiguous manifestation of assent *only if the user is explicitly advised that the act of clicking will constitute assent* to the terms and conditions of an agreement.  The presence of "an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound" is critical to the enforceability of any browsewrap-type agreement.

*Id.* at 857-58 (emphasis added).  The Ninth Circuit acknowledged that the webpages at issue "did provide advisals concerning the terms and conditions in proximity to the 'continue' buttons," but "'even close proximity of the hyperlink to the relevant buttons users must click on – without more – is insufficient to give rise to constructive notice.'"  *Id.* at 858.

[T]he notice must explicitly notify a user of the *legal significance of the action she must take* to enter into a contractual agreement.  The notice did not do so here.  Both webpages stated, "I understand and agree to the Terms & Conditions," but they did not indicate to the user *what action would constitute assent* to those terms and conditions.  Likewise, the text of the button itself gave no indication that it would bind plaintiffs to a set of terms and conditions.  This notice defect could easily have been remedied by including language such as, "By clicking the Continue >> button, you agree to the Terms & Conditions."

*Id.* (emphasis added; adding that, "[b]ecause the textual notice was not conspicuous and did not explicitly inform . . . that by clicking on the 'continue' button they would be bound by the terms and conditions, the presence of the words 'which includes mandatory arbitration' in the notice is of no relevance").

D.    Inquiry Notice Theory in the Case at Bar

In the instant case, Disney contends that the inquiry notice has been met as a result of (1) Mr. Sadlock registering for an ESPN account and (2) his subscribing to ESPN+.

The Court rejects Disney's contention in (1).  Although there is evidence that Mr. Sadlock did register for an ESPN account, Defendants have not offered any evidence as to what information was presented to Mr. Sadlock at the time he registered his account.

The critical inquiry, therefore, is with respect to (2) – *i.e.*, what information was Mr. Sadlock given at the time he subscribed for ESPN+.  As indicated above, Disney has offered

1   evidence that Mr. Sadlock had to have used either the Stack Registration Process or the Switch

2   Registration Process.  But Disney does not provide any evidence as to which process Mr. Sadlock

3   *actually* used.  In the absence of any such evidence, Mr. Sadlock fairly argues that the only

4   question is whether he was on inquiry notice based on the Switch Registration Process, the long-

5   form webpage at issue.[5]

6           As noted above, the issue of inquiry notice requires the Court to consider the following:

7                   (1) [does] the website provide[] reasonably conspicuous notice
                    of the terms to which the consumer will be bound; and (2) [does]
8                   the consumer take[] some action, such as clicking a button or
                    checking a box, that unambiguously manifests his or her assent
9                   to those terms.

10  *Berman*, 30 F.4th at 856 (emphasis added).

11          1.      Payment Webpage

12          For the Switch Registration Process, a consumer is presented with the above payment

13  webpage or screen.

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26

27  [5] Although the complaint mentions Mr. Sadlock simply browsing the ESPN.com website, he does
    not make any contention that the Subscriber Agreements related to Disney Streaming are
28  inapplicable to his case.  This may be because (as asserted by Disney), "[t]he ESPN.com website
    exclusively hosts ESPN+'s web-based content."  Mot. at 2.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



26        The first question is whether this screen provided Mr. Sadlock with reasonably

27   conspicuous notice of the terms to which he would be bound, *i.e.*, the Subscriber Agreement.

28   Admittedly, this screen is not as problematic as the ones at issue in *Berman* or the one at issue in

*Burzdak v. Universal Screen Arts, Inc.*, No. 21-cv-02148-EMC, 2021 U.S. Dist. LEXIS 154091 (N.D. Cal. Aug. 16, 2021).  But that does not end the inquiry.  A less problematic screen can still fail to provide reasonably conspicuous notice to users.  For several reasons, the Court concludes that the screen at issue did *not* provide reasonably conspicuous notice based on the totality of the circumstances.  This includes the following:

- The Subscriber Agreement is not mentioned at all until, in essence, the bottom of the screen.

- The paragraph that contains the reference to the Subscriber Agreement is in small font.  Furthermore, comparatively, that font size is smaller than that used for other text in the payment webpage.

- The text used in the paragraph that refers to the Subscriber Agreement is not so much white but rather whitish/greyish in color, and thus does not stand out against the black background.

- Similarly, the text used for the term "Subscriber Agreement" – although blue in color (which concededly indicates a hyperlink) – appears muted and thus does not stand out against the black background.

- The hyperlink to the "Subscriber Agreement" is buried in six lines of text and is located five lines away from the "Agree and Subscribe" button.

- There are a number of other elements on the screen that distract from the reference to the Subscriber Agreement – *e.g.*, the exhortation to "Get the best movies, shows and sports"; the description of the Disney bundle; and the promotion of an "Upgrade" to Hulu with no ads.  Notably, these elements are all in larger size font and employ design elements such as bolding to catch the eye.  Furthermore, the bulk of the remaining screen is devoted to payment for the service being purchased.

The considerations above distinguish the instant case from other cases where courts have found reasonably conspicuous notice.  *See, e.g.*, *Dohrmann v. Intuit, Inc.*, 823 Fed. Appx. 482, 484 (9th Cir. 2020) (noting that "a user accessing a TurboTax account, after entering a user ID and password, was required to click a 'Sign In' button, directly under which the following language

1   appeared: '*By clicking Sign In, you agree to the Turbo Terms of Use, TurboTax Terms of Use, and*

2   *have read and acknowledged our Privacy Statement*'"; there were "light blue hyperlinks" for the

3   Terms of Use and the Privacy Statement) (emphasis in original); *Hansen v. Ticketmaster Entm't,*

4   *Inc.*, No. 20-cv-02685-EMC, 2020 U.S. Dist. LEXIS 233538, at *8 (N.D. Cal. Dec. 11, 2020)

5   (noting that "a customer would sign into a Ticketmaster account by providing certain information

6   (email address and password) and then clicking a blue button that says 'Sign in,'" and "[r]ight

7   above the blue button is the following text (which is in a slightly smaller font size compared to

8   other text): 'By continuing past this page, you agree to the Terms of Use [displayed in blue font]

9   and understand that information will be used as described in our Privacy Policy'"; acknowledging

10  a graphic on one side but emphasizing that the sign-in box was "still prominently displayed").[6]

11         In its motion, Disney protests that

12              each of the elements Plaintiff appears to take issue with – [such as]
                the inclusion of boxes to enter personal information and credit card
13              information, options to store that information, and options to
                upgrade the subscription – highlights the singular purpose of the
14              webpage: to enable customers to purchase and register for a
                subscription with Disney which requires agreeing to a Subscriber
15              Agreement. . . .

16              The design of Disney's payment webpage stands in stark contrast to
                Plaintiff's cited examples . . . , which include highly-distracting text
17              and promotional materials unrelated to the agreement being noticed.
                For instance, in *Burzdak*, the court noted that "attention [was]
18              diverted away from the Terms of Use" [which governed a VIP
                Insider membership program that cost a monthly fee] because
19              "visual prominence – through bolding, a different color, and/or
                capitalization – [was] given to other text, including 'Free Shipping' .
20              . . ."

21  Reply at 7 (emphasis omitted).  The Court is not persuaded.  The webpage here is very long and

22  contains not just registration mechanics but also promotional/marketing language designed to

23  upsell the Disney Bundle.  And, as noted above, the reference and link to the Subscriber

24  Agreement is not as conspicuous as that in, *e.g.*, *Dohrmann* and *Hansen*.

25         Nor did Mr. Sadlock, by clicking the "Agree and Subscribe" button, unambiguously

26  manifest his assent to the terms of the Subscriber Agreement.  Mr. Sadlock undoubtedly knew that

27  _____

28  [6] The screens at issue in *Dohrmann* and *Hansen* can be found in the appendix attached to this order.

20

he was purchasing a subscription with Disney, but that – by itself – does not mean he should have known there was a Subscription Agreement to which he would be bound.  This is particularly true given the fact that the notice of the Subscriber Agreement was inconspicuous.  Moreover, the blue "AGREE & SUBSCRIBE" button at the bottom of the screen could easily be interpreted to mean that Mr. Sadlock was just agreeing to pay Disney in exchange for the subscription to the service – not that he was agreeing to the Subscription Agreement.

In finding a lack of reasonably conspicuous notice here, the Court is cognizant of the *Lee v. Ticketmaster L.L.C.*, 817 Fed. Appx. 393 (9th Cir. 2020), a Ninth Circuit decision that this Court cited in *Burzdak*.  Putting aside the fact that *Lee* is an unpublished decision, it is distinguishable.  In *Lee*, the court found the Terms of Use sufficiently conspicuous even though they were referred to as part of a broader payment screen.  But notably, the Terms of Use in *Lee* were referred to in two different screens – *i.e.*, not just the payment screen but also the sign-in screen.  The sign-in screen in *Lee* was far simpler and less cluttered compared to the screen at issue in this case.  Moreover, even the payment screen in *Lee*, taken in isolation, was simpler and more direct; for example, there was a single sentence immediately above the "Place Order" button: "By clicking "Place Order, you agree to our Terms of Use."  In contrast, here, the reference to the Subscriber Agreement was part of a three-sentence, six-line paragraph, and the term "Subscriber Agreement" was five lines above the "AGREE & SUBMIT" button.  Finally, *Lee* is different from the instant case in that *each time* the plaintiff signed in or made a payment, he was given notice about the Terms of Use.  Here, there was just a one-time payment to sign up for the Disney+ streaming service.

Accordingly, the Court concludes that, although not the most egregious screen it has seen (either for a case before it or for a case adjudicated by a different court), the screen nonetheless failed to provide reasonably conspicuous notice of the Subscriber Agreement.  Nor did Mr. Sadlock take some action that unambiguously manifests his assent to the terms of the agreement.  *See Berman*, 30 F.4th at 856 (emphasis added).

2.    Email Notices of the Update to the Subscriber Agreement

Disney contends that, even if the payment webpage did not give Mr. Sadlock reasonably

conspicuous notice and even if he did not unambiguously assent, the Court should still compel arbitration because he was given inquiry notice of the Subscriber Agreement as a result of two different emails sent to him about an *updated* Subscriber Agreement – after which he continued to use the Disney+ streaming service.[7] Disney has authority to support its position that emails plus continued use can be enough to meet the *Berman* inquiry notice test. *See In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016) (Donato, J.) (noting that plaintiffs "were provided notice that the terms of the user agreement were changing through an email from Facebook sent directly to the email addresses each plaintiff had on file with Facebook" and that "individualized notice in combination with a user's continued use is enough for notice and assent"); *West v. Uber Techs.*, No. 18-CV-3001-PSG-GJS, 2018 U.S. Dist. LEXIS 233550, at *13 (C.D. Cal. Sept. 5, 2018) (stating that "[c]ourts have found that when consumers receive emails such as this one [*e.g.*, having a subject line stating that Uber had updated its terms of use, including in the body that the arbitration agreement had been revised, and providing a link to the updated terms], continued use of the service or product constitutes assent to the updated terms"); *In re Uber Techs.*, No. ML 18-2826 PSG (GJSx), 2019 U.S. Dist. LEXIS 206663, *11 (C.D. Cal. Aug. 19, 2019) (stating the same as in *West*).

In response, Mr. Sadlock contends that, in these cases, "there was a binding arbitration agreement when the user *first* signed up for the services at dispute," Opp'n at 14 (emphasis added), and the courts only considered the post-agreement emails as a secondary matter. This distinction is not material. There was undisputedly an agreement of some kind between Mr. Sadlock and Disney based on his purchase of the subscription service, even if there was no agreement to the terms contained in the Subscription Agreement (including the arbitration provision). Mr. Sadlock fails to explain why it would not be permissible for Disney to in effect modify that existing agreement to purchase the subscription by adding the terms of the Subscription Agreement.

If an updating email can modify an agreement by changing or adding terms, the question

---

[7] There is no claim that Mr. Sadlock had *actual* notice of the Subscriber Agreement or terms contained therein as a result of the emails.

United States District Court
Northern District of California

1    turns again on the quality of notice.  Thus, the analysis with respect to the emails sent to Mr.

2    Sadlock therefore is the conventional inquiry notice analysis:

3            (1) [does] the [email] provide[] reasonably conspicuous notice of
             the terms to which the consumer will be bound; and (2) [does]
4            the consumer take[] some action . . . that unambiguously
             manifests his or her assent to those terms.
5

6    *Berman*, 30 F.4th at 856 (emphasis added).

7          Here, the Court finds both elements of the test satisfied.  First, the emails gave Mr. Sadlock

8    reasonably conspicuous notice of the Subscriber Agreement.  As described above, each email had

9    the subject line "We're updating our Subscriber Agreement," and the body of the email began

10   with, in effect, a large header repeating that message: "WE'RE UPDATING OUR SUBSCRIBER

11   AGREEMENT."  Raschke Decl., Ex. A (email).  The first full paragraph reiterated that updates to

12   the Subscriber Agreement were being made, and the second paragraph explained that, "[f]or prior

13   and existing subscribers, like you, these terms will be effective beginning on November 3, 2022."

14   Raschke Decl., Ex. A.  The next paragraph "encourage[d]" Mr. Sadlock to "review the updated

15   Subscriber Agreement in full and save a copy for your files.  Once effective, it will govern your

16   use and enjoyment of your Disney+ or ESPN+ subscription."  Raschke Decl., Ex. A.  Although the

17   term "Subscriber Agreement" was only underlined and not enhanced by a different color font, it

18   was clear that this was a hyperlink given the context of the sentence, encouraging Mr. Sadlock to

19   review the agreement.  That the underlined term was in fact a hyperlink was underscored by the

20   fact that the only other terms that were underlined were "the prior version of our Subscriber

21   Agreement will apply until [November 3, 2022]" and "Please visit our Help Center for more

22   information about you subscription."  Finally, the email took the time to call out specific changes

23   of note to the Subscriber Agreement – only four total – and one of those was an *express update to*

24   *the arbitration agreement*.  Mr. Sadlock was thus put on notice of not just the Subscriber

25   Agreement but also that it contained an arbitration provision specifically.

26         Mr. Sadlock argues that the email was lengthy and that the reference to the arbitration

27   agreement came at the end.  While these arguments are not without any merit, the Court is not

28   convinced.  Perhaps the email could have been shorter but it was not unduly lengthy, and it was

United States District Court
Northern District of California

1    certainly clear that changes were being made to whatever agreement existed between Mr. Sadlock

2    and Disney.  Furthermore, although the reference to the arbitration agreement came last, there

3    were only four total changes to the agreement that were highlighted in the email.  This is not a

4    situation where the reference to the arbitration agreement was buried and difficult to discern.

5            Second, the Court concludes that Mr. Sadlock unambiguously manifested assent to the

6    terms of the Subscriber Agreement.  The Court agrees with the *Facebook*, *West*, and *Uber* courts

7    that emails followed by continued use is sufficient to establish assent.  Notably, the email

8    explained to Mr. Sadlock that "these terms will be effective beginning on November 3, 2022."

9    Raschke Decl., Ex. A.  Mr. Sadlock does not dispute that he could have immediately ended his

10   contractual relationship with Disney instead of continuing to use the service.  This does not appear

11   to be a situation where, *e.g.*, Mr. Sadlock was bound to an agreement with Disney that lasted for a

12   year, with Disney changing terms midstream wherein Mr. Sadlock was forced to live with those

13   new terms until the year-long contract expired.[8]

14           Accordingly, the Court holds that the emails provided reasonably conspicuous notice of the

15   Subscriber Agreement and that Mr. Sadlock unambiguously manifested assent to the terms of the

16   agreement by continuing to use the streaming service after he received the emails.  Because the

17   *Berman* inquiry notice test has been met, there was contract formation.  Mr. Sadlock did enter into

18   _____

19   [8] To the extent Mr. Sadlock has relied on *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093 (9th Cir.
     2023), in his opposition, *see* Opp'n at 15 (claiming that *Jackson* establishes "merely using a

20   service after receiving an email with updated terms does not, in itself, show a manifestation of
     assent"), the case does little to advance his position.  There, the Ninth Circuit noted that,

21
22           [w]hile Amazon may not be required to product the actual verbatim
             content of the email it sent to Flex drivers notifying them of the

23           2019 TOS, the evidence that it did provide was insufficient to allow
             the court to determine whether the drivers had notice of the new

24           terms. . . . [I]f Flex drivers did not receive notice of the revised TOS,
             the fact that they continued working and using the Amazon Flex app

25           could not demonstrate assent.  Under California law, therefore, a
             reasonable person would not believe that the Flex drivers' conduct

26           constituted an intent to be bound by a new arbitration provision in
             the 2019 TOS.

27   *Id.* at 1100.  It is clear from the above that *Jackson* is distinguishable from the instant case: in
     *Jackson*, the defendant failed to provide information about the content of the email that was sent.

28   *See also id.* at 1099 ("Amazon did not provide the court with a copy or description of any such
     [email] notice . . . . Nor did Amazon make any showing that Jackson received such notice.").

United States District Court
Northern District of California

the Subscription Agreement with Disney, and that agreement included an arbitration provision.

To be clear, the Court's ruling here is based on the facts and arguments presented before it. The Court is not opining that, in any instance in which a defendant sends an email giving notice of updated terms and a plaintiff continues to use the defendant's service, the inquiry notice test has been satisfied. Indeed, the Court can see potential problems with a defendant relying on notice via email (problems aside from whether the email gave reasonably conspicuous notice of the terms of use). For example, was the email in fact received, or was the email shunted into a spam folder? Is there evidence that the plaintiff actually saw the email? On a macro level, what is the data on the likelihood that emails of this kind are actually received and opened by recipients under similar circumstances? The Court also notes that, should a defendant choose to give notice of updated terms via email, there are better ways to establish assent by the plaintiff instead of relying on continued use of the service. For instance, presumably, the email could ask the plaintiff to check a box contained in the body of the email, or to click a link contained in the email, confirming receipt of the notice and agreeing to the updated terms of use. There may be forensic tools to prove a particular email was received and opened by the recipient. By relying solely on the sending of an email and continued service without requiring the recipient to take some demonstrable affirmative step or proof of receipt and review, the proponent of the putative notice risks a finding of no constructive notice and assent. Emails present a different scenario that the situation where upon initial acceptance, the subscriber takes an affirmative step (*e.g.* clicking an "agree and subscribe" button) acknowledging receipt of notice. In this case, however, Mr. Sadlock has not contended he did not receive or see the emails in question and has made no argument presenting concerns such as those identified above.

///

///

///

///

///

///

United States District Court
Northern District of California

### III.   CONCLUSION

In opposing the motion to compel arbitration, Mr. Sadlock has contested only contract formation.  He has not launched any challenge to, *e.g.*, Disney's assertions that: (1) if there was an agreement to arbitrate, then gateway issues of arbitrability have been delegated to the arbitrator and (2) the arbitration agreement was not unconscionable.  Accordingly, for the reasons stated above, the Court concludes that there was an agreement to arbitrate and grants Disney's motion to compel and to stay proceedings pending arbitration.

This order disposes of Docket No. 18.


**IT IS SO ORDERED**.


Dated: July 31, 2023

_____
EDWARD M. CHEN
United States District Judge

1

**APPENDIX**



*In re Intuit Free File Litig.*, No. 3:19-cv-02546 CRB (N.D. Cal.) (Docket No. 97-2) (Sun Decl. ¶ 5).

*Hansen v. Ticketmaster Entm't, Inc.*, No. C-20-2685 EMC (N.D. Cal.) (Docket No. 23-3) (Tobias Decl., Ex. 3).